## BRAICKS et al. v. HENRICKSEN, Acting Collector of Internal Revenue.
### No. 189.
District Court, W. D. Washington, S. D.

Feb. 14, 1942.

JONES & BRONSON, of Seattle, Wash., for plaintiff.

J. Chas. Dennis, U. S. Atty., of Seattle, Wash., Harry Sager, Asst. U. S. Atty., of Sumner, Wash., and Thomas R. Winter, Sp. Asst. to the Chief Counsel, of Seattle, Wash., for defendant.

SCHWELLENBACH, District Judge.

In September, 1937, the directors of Pommerelle Company, Inc. (hereafter called the Old Company), concluded that the stated value of its capital stock was too low and that the corporation was paying excess profits taxes in an amount larger than the company's situation required. For the sole purpose of attempting to correct this situation and on the advice of the corporation's tax counsel, the following plan was devised and effectuated: (1) Proceedings were instituted for the liquidation of the Old Company. (2) All of the assets of the Old Company were transferred to plaintiffs as trustees for the stockholders and as liquidating trustees of the company by the declaration of a liquidating dividend. (3) The stockholders of the Old Company were advised by the company that the receipt on their behalf by the trustees of their proportionate share in the assets of the Old Company constituted a dividend subject to tax and every stockholder was advised as to the increase in his income tax resulting from the receipt of such dividend. (4) With one exception, each of the stockholders paid such income tax in accordance with such advice. (The exception was an isolated one and his failure to pay had no connection with the corporation or the plan). (5) Contemporaneous with these transactions, the Pommerelle Com-

pany (hereafter called the New Company) was formed. (6) Each stockholder of the Old Company was notified that he was free to choose as to whether or not to enter into the New Company and financial arrangements were made to make possible the purchase for cash from each stockholder of his proportionate share of the assets held for him by the plaintiffs as trustees. (7) Each stockholder subscribed for the stock of the New Company, the stock subscription obligation being payable in cash. (8) The subscribers to the capital stock of the New Company thereupon offered to the New Company that they would cause to be transferred to the New Company all of the assets held for them by the trustees subject to the obligations of the Old Company which the New Company was to agree to pay in fulfillment of their capital stock subscriptions of the New Company. (9) The New Company accepted the offer and stock was issued to the individuals in the same proportionate share as they owned stock in the Old Company. (10) The assets were shown on the books of the New Company as of their net value as shown on the books of the Old Company. (11) The dissolution of the Old Company was completed.

In making income tax return for the year 1937, plaintiffs, as liquidating trustees, claimed a dividends paid credit under Section 27(f) of the Revenue Act of 1936, 49 Stat. 1648, 26 U.S.C.A. Int.Rev.Acts, page 838, on such portion of the amount distributed in liquidation which was properly chargeable to the earnings or profits of the Company accumulated after February 28, 1913. Defendant disallowed this credit. He contended that the foregoing transaction was not a liquidation as contemplated in Section 27(f) of the Revenue Act of 1936, but was rather a reorganization as defined in Section 112(g) (1) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 858. He concluded that, since the transaction was a reorganization, it was not subject to a tax because there was no gain or loss which would be recognized under Section 112 of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 855. Defendant then concluded that, since there was no gain or loss recognized, the transaction was governed by Section 27(h) of the Revenue Act of 1936 which provides "if any part of a distribution (including stock dividends and stock rights) is not a taxable dividend in the hands of such of the shareholders as are subject to taxation under this title for the period in which the distribution is made, no dividends paid credit shall be allowed with respect to such part." In support of that position, defendant relies on Centennial Oil Co. v. Thomas, 5 Cir., 1940, 109 F.2d 359. Defendant contends that the taxes paid by the stockholders of the Old Company on the liquidating dividends received by them were improperly paid and that, since the real distribution was to the New Company and the New Company was not subject to a tax as the result of the property it received and since subsection (h) of Section 27 of the Revenue Act of 1936 controls subsection (f) of the same section, that the dividends paid credit is not allowable. The undistributed profits tax was levied and paid. This action is for its return.

It should be noted at the outset that the purpose of the levy is to collect taxes imposed by Section 14(b) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 823, upon the undistributed profits of a corporation. Under that section, the taxes are computed on such portions of the "undistributed net income" as are in excess of certain percentages of the "adjusted net income." The latter phrase is defined as net income less normal income tax and certain specified credits. The phrase "undistributed net income" is defined as "the adjusted net income minus the sum of the dividends paid credit provided in section 27." Section 14(a) (2). It should further be noted that the sole purpose of the entire transaction was to secure an adjustment in the amount of the stated capital used in the business. Defendant does not challenge the propriety of attempting to accomplish this purpose. The testimony also is conclusive that if there was any avoidance of the undistributed profits tax, such avoidance was incidental and in no way may be considered as a motivating factor in the transaction.

There are two questions implicit in the decision of any tax case:

First, whether the mechanism adopted in a particular transaction had as its purpose the evasion of tax liability. I can find nothing ulterior in this transaction. Insofar as the undistributed profits tax is concerned, it isn't necessary here for the tax payers even to rely upon their recognized legal right (United States v. Isham, 17 Wall. 496, 21 L.Ed. 728; Superior Oil Company v. Mississippi, 280 U.S. 390, 50 S.Ct. 169, 74 L.Ed. 504; Jones v. Helvering,

63 App.D.C. 204, 71 F.2d 214) to decrease the amount of what otherwise would be their taxes by means which the law permits.

██ Second, the court must attempt to ascertain whether by the transaction the revenue raising ambition of the Congress in imposing the tax has been fulfilled. There can be no doubt from the legislative record that the purpose of Congress in imposing the undistributed profits tax was to increase the revenue either by taxing corporations that failed to distribute their profits to their stockholders or by subjecting the stockholders to higher taxes as the result of forcing the corporate profits into the hands of the stockholders. (See statement of Senator King in charge of the Bill in the Senate, 80 Congressional Record, p. 8647 et seq.; statement of Senators Black and La-Follette in support of the so-called Black-LaFollette substitute, 80 Congressional Record, p. 8526 et seq.; statement of Congressman Doughton, Chairman, Ways and Means Committee, 80 Congressional Record, p. 10269 et seq.) In the absence of clear and unambiguous language the Court will not deviate from the principle which is necessitated by the declared objective of Congress. Maguire v. Commissioner, 313 U.S. 1, 61 S.Ct. 789, 85 L.Ed. 1149.

It is true that the argument was made to Congress, largely from outside the Congress, that other collateral benefits of an economic and social nature would accrue from the adoption of the measure; these to come from the increased purchasing power of the dividend-receiving stockholders. While this argument may have had its influence in the adoption of the measure, it was not the Congressional objective. The Congressional intent was limited to the possibility of the 710 million dollar revenue increase discussed by Chairman Doughton. Furthermore, Congress at all times fully recognized that the compelling of the expenditure of dividend moneys received by stockholders in the purchase of consumer goods did not lie within the sphere of legislative enactment. It must, therefore, be realized that the transaction under inspection here fully complied with the legislative purpose for the raising of revenue and that the mechanism used in the transaction was not devised with an ulterior purpose.

Defendant relies upon a large number of cases holding that the courts will strictly scrutinize any corporate transaction which results in the avoiding of the payment of taxes; this for the purpose of seeing whether what results is tax avoidance or tax evasion. Too many cases are cited to justify an analysis of all of them here. They are all cases in which the tax payers attempt to evade the payment of taxes or gains resulting from the transfer or sale of corporate assets or securities. They are cases which would be in point here if this action was on behalf of the stockholders for the return of their individual taxes paid on the liquidating dividend from the Old Company and who sought such return on the ground that this was a non-taxable reorganization as defined in Section 112(g) (1) of the Revenue Act of 1936, or as provided in any of the other subsections of Section 112. For example, in Minnesota Tea Co. v. Helvering, 302 U.S. 609, 58 S.Ct. 393, 395, 82 L.Ed. 474, the money received by the corporation was turned over to its stockholders who agreed to pay off the indebtedness of the corporation in an amount equal to the amount which they received. The court held that this was not a distribution to the stockholders under the meaning of Section 112(d) (1 and 2) of the Revenue Act of 1928, but was a taxable gain received by the corporation. The Supreme Court said:

"Payment of indebtedness, and not distribution of dividends, was, from the beginning, the aim of the understanding with the stockholders and was the end accomplished by carrying that understanding into effect. A given result at the end of a straight path is not made a different result because reached by following a devious path. * * * The relation of the stockholders to the matter was that of a mere conduit."

In Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 267, 79 L.Ed. 596, 97 A.L.R. 1355, the tax payer was the owner of all of the stock of the original corporation. That corporation held a certain asset which she decided to sell for her individual benefit. For the sole purpose of enabling her to sell this asset and make the profit without paying tax upon the gain, the tax payer organized a new corporation to which the transfer was made. The Supreme Court said:

"But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it

should perform, no other function. * * * The whole undertaking, though conducted according to the terms of subdivision (B), was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else."

These two Supreme Court cases are typical of cases upon which defendant relies in dealing with the question of the use of an artificial corporate reorganization for the purpose of avoiding the tax upon the gain realized as a result of the transfer or sale of a capital asset or security. Since the stockholders here are not seeking to avoid payment of the tax upon the gain received by them in the transaction, this group of cases is not in point here.

Typical of the second group of cases in which an effort was made to classify as a reorganization a mere sale of capital assets by one corporation to another is Cortland Specialty Co. v. Commissioner, 2 Cir., 60 F.2d 937, 940. There the consideration was cash paid, promissory notes delivered and a promise to pay additional cash 9 days after the transaction was consummated. The basis for arguing that there was a reorganization was that the second corporation purchased 91½% of the assets of the first. The Circuit Court of Appeals for the Second Circuit said this:

"Section 203 of the Revenue Act of 1926 [26 U.S.C.A. Int. Rev.Acts, page 148] must be interpreted in this setting. Its purpose was to relieve those interested in corporations from profits taxes in cases where there was only a change in the corporate form in which business was conducted without an actual realization of any gain from an exchange of properties. * * * There can be no justice or propriety in taxing one corporation who transfers its properties for cash and in relieving another that takes part of its pay in short time notes."

The third group of cases upon which defendant relies are those referring to the relationship between the liquidating trustees and the corporation. Typical of these is Taylor Oil & Gas Co. v. Commissioner, 5 Cir., 47 F.2d 108. In this case, after a sale of all of the assets of the corporation had been negotiated, it was discovered that such a sale would result in such a profit as would cause a thirty thousand dollar income tax liability to the company. With the sole purpose of avoiding this liability, it was decided to dissolve the company. Liquidating trustees were appointed for the purpose of dissolving the company and winding up its affairs. The court held the case was controlled by the Treasury regulation (Art. 547, Treas.Reg. 45, 1920) which provided:

"The corporate existence is continued for the purpose of liquidating the assets and paying the debts and such receiver or trustees stand in the stead of the corporation for such purposes. Any sales of property by them shall be treated as if made by the corporation for the purpose of ascertaining a gain or loss."

These cases do not go so far as to hold that the trustees may not also be trustees for the individuals who formerly were stockholders if there is a bona fide liquidation with no purpose of evading taxes.

In this case, in order to appraise the validity of defendant's initial position we must determine whether the transaction here involved comes within the definition of reorganization contained in Section 112(g) (1) of the Revenue Act of 1936. This definition follows:

"(1) The term 'reorganization' means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation, or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (D) a recapitalization, or (E) a mere change in identity, form, or place of organization, however effected."

It requires no discussion to conclude that what we have here is not encompassed by subdivisions (A), (D) or (E). Subdivision (C) is eliminated by the case of Bondholders Committee, Marlborough Investment Company, v. Commissioner, 314 U.S. —, 62 S.Ct. 537, 539, 86 L.Ed. —, in which the Supreme Court said:

"Clause B covers certain transfers 'by a corporation' of all or a part of its assets 'to another corporation' where the transferor or its stockholders continue in control. These were not 'properties' of Marlborough Investment Co. It had long since

ceased to own them. It was not the 'transferor.' * * * The 'reorganization' provisions in question cover only inter-corporate transactions."

Plaintiffs contend that this transaction does not come within the purview of subsection (B) for the reason that the acquisition by the New Company was not an exchange solely of all or a part of its voting stock but that there was included the actual consideration of the assumption of the liabilities of the Old Company by the New Company. But, as was pointed out in Helvering v. Southwest Consolidated Corporation, 314 U.S. ——, 62 S.Ct. 546, 550, 86 L.Ed. ——, Congress, in 1939, amended Clause (B) by adding: "But in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded." 53 Stat. 871. This amendment was made retroactive as far back as 1924. It was adopted to avoid the consequences of United States v. Hendler, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018.

Plaintiff further contends that this transaction is not covered by (B) because there is lacking in it the continuity of interest made requisite in the case of Pinellas Ice & Cold Storage Co. v. Commissioner of Internal Revenue, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428. Whether this contention is correct depends upon the meaning of the Supreme Court in the case of Helvering v. Alabama Asphaltic Limestone Company, 314 U.S. ——, 62 S.Ct. 540, 542, 86 L.Ed. ——. In that case, the Court, speaking through Justice Douglas, stated:

"From the Pinellas case, Pinellas Ice & Cold Storage Co. v. Commissioner of Internal Revenue, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428, to the Le Tulle case, Le Tulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355, it has been recognized that a transaction may not qualify as a 'reorganization' under the various revenue acts though the literal language of the statute is satisfied. * * * The Pinellas case introduced the continuity of interest theory to eliminate those transactions which had 'no real semblance to a merger or a consolidation' (287 U.S. page 470, 53 S.Ct. page 260, 77 L.Ed. 428) and to avoid a construction which 'would make evasion of taxation very easy.' "

The sole question decided in the Alabama Limestone case is that the continuity requirements of the Pinellas and the Le Tulle cases are satisfied where the creditors of an insolvent debtor step into the shoes of the stockholders by virtue of invoking the processes of law prior to the actual transfer to the new corporation. It dates the equity ownership of the creditors from the time of the institution of bankruptcy proceedings. The Court took care to emphasize that this conclusion involved no conflict with the principle of the Le Tulle case. It made clear that the "determinative and controlling factors" were the "debtor's insolvency and an effective command by the creditors over the property."

The answer to this particular problem in this case must be found in an analysis of the last paragraph of the Alabama Limestone decision. Here the new company did not receive its assets directly from the old company but from plaintiffs as trustees. Was this break in the chain a mere "transitory phase of an arrangement" which added "nothing of substance to the complete affair"? Was it "no more than" an "intermediate procedural device utilized to enable the new corporation to acquire all the assets of the old one"? In answering these questions, it is important to note that in using this language, the Supreme Court cites Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355, and Helvering v. Bashford, 302 U.S. 454, 58 S.Ct. 307, 82 L.Ed. 367. In the Gregory case, it will be remembered the court denominated the conveyance as "an elaborate and devious form * * * masquerading as a corporate reorganization." [293 U.S. 465, 55 S.Ct. 268, 79 L.Ed. 596, 97 A.L.R. 1355.] In the Bashford case, a temporary ownership of the stock by the intermediary was declared to be not only transitory but also "without real substance." [302 U.S. 454, 58 S.Ct. 309, 82 L.Ed. 367.]

In the case at bar, the holding of the assets of the Old Company by plaintiffs was of brief duration. During that duration, however brief, the persons who were stockholders of the Old Company had an absolute irrevocable right to insist upon receiving their proportionate share of the assets of the Old Company. It is true that no one of them exercised that right. The fact that no one of them exercised the right raises the question of good faith in determining whether their right was something "of substance added to the complete affair." The question of good

faith must be resolved in favor of the transaction on the basis of the fact of the payment of income tax by all but one of the old stockholders. This was a positive recognition by each of them that during the interim period they owned their respective interests in the assets formerly owned by the Old Company, not as stockholders in either company but as individuals. That being true, plaintiffs transferred the assets not as liquidating trustees of the Old Company but as trustees for the individuals who had been stockholders of the Old Company. Consequently, the continuity requirement is not satisfied and this cannot be classified as a reorganization as defined in the statute.

In his reply brief, largely as a result of suggestions by the Court during oral argument, defendant suggests that the Court should disregard the details of the transaction and consider substance rather than form. He urges that the New Company had the same assets, the same stockholders and the same business as the Old Company and that those assets in excess of paid in capital were not distributed but were still in use by the New Company. He urges that, consequently, the undistributed profits tax should be levied. Such an argument is tempting and attractive. Its attraction comes from its simplicity. Its danger lies in its over-simplification. Discussing a similar argument in the case of Commissioner v. Sansome, 2 Cir., 60 F.2d 931, 933, Judge Learned Hand said that the courts had beclouded troublesome questions "by recourse to such vague alternatives as 'form' and 'substance,' anodynes for the pains of reasoning." I wish to make it clear that defendant's counsel offered the argument only because the court, during oral argument, suggested it and not as a substitute for his very carefully reasoned and well-documented brief.

Even if defendant's position was correct and we were compelled to ignore the distribution to the individual stockholders of the Old Company and the taxes paid by them thereon, defendant would be confronted with the provisions of subdivision (f) of Section 27 of the Revenue Act of 1936, 49 Stat. 1648, which reads as follows:

"(f) Distributions in Liquidation. In the case of amounts distributed in liquidation the part of such distribution which is properly chargeable to the earnings or profits accumulated after February 28, 1913, shall, for the purposes of computing the dividends paid credit under this section, be treated as a taxable dividend paid."

Defendant meets this subsection with the argument that it is qualified by subsection (h) of Section 27 of the Revenue Act of 1936 which I have previously quoted. He contends that, since a part of the distribution made in this case is not a taxable dividend in the hands of the New Company for the period in which the distribution was made, no dividend paid credit should be allowed with respect to such part. To reach such a conclusion, it is necessary to find that subsection (h) qualifies or controls subsection (f). This question has been decided adversely to defendant's position in numerous cases by the Board of Tax Appeals. A most complete discussion of the subject is found in the case of Credit Alliance Corporation v. Commissioner, 42 B.T.A. 1020. The question has been considered by three of the Circuit Courts of Appeal. In the first case, Centennial Oil Co. v. Thomas, 109 F.2d 359, the Fifth Circuit sustained defendant's position but with a most vigorous dissenting opinion by Judge Hutcheson. On the petition to review the decision of the Board of Tax Appeals in the Credit Alliance case, the Circuit Court of Appeals for the Fourth Circuit decided unanimously against defendant's position. Helvering v. Credit Alliance Corporation, 122 F.2d 361. The Circuit Court of Appeals for the Second Circuit held likewise in Commissioner v. Kay Mfg. Corporation, 122 F.2d 442. It is my duty to accept the weight of authority upon this question. Furthermore, the Supreme Court has granted certiorari in the Credit Alliance case, 62 S.Ct. 301, 86 L.Ed. ——, and what I may say upon the merits need only be brief. However, in each of the three cases which reached the Circuit Courts there was involved an issue which is not present here. That was the question of the simplification of corporate structure and the relationship between the Message of the President on June 19, 1935 (H.R.Rep. #1681, 74th Cong. 1st Session, p. 4) and the language of the 1936 Act. Because of that, I will state briefly why I think the defendant's position is unsound.

■ Fundamentally, the difference of opinion involves a conflict between two rules of statutory interpretation. In the various cases, the Commissioner main-

tained that subsection (h) should be controlling because it came later in the statute than subsection (f). This rule runs headon into another rule to the effect that as between two sections of the statute that which is the more specific will take precedence over that which is the more general. It is my opinion that the second rule is much more persuasive than the first. There is no sound legislative practice to support the first. A complicated bill cannot be written in one paragraph or one section. There is no reasonable relationship between the position of a section in the statute and its importance. It is an arbitrary rule of construction which has been called artificial and to be resorted to only in extremis. 59 C.J. 1000; People ex rel. Mason v. McLare, 99 N.Y. 83, 1 N.E. 235; Commercial Trust Co. v. Hudson County Board of Taxation, 86 N.J.L. 424, 92 A. 263.

On the other hand, there is a sound reason for the second rule. When the legislature deals with a specific subject, the courts have a right to assume that much more particular and specific care was given than when it deals with a general subject. United States v. Chase, 135 U.S. 255, 10 S.Ct. 756, 34 L.Ed. 117; Rodgers v. United States, 185 U.S. 83, 22 S.Ct. 582, 46 L.Ed. 816. There can be no doubt that subsection (f) is more specific than subsection (h). It limits its effect to distributions in liquidation and it involves not the entire distribution in liquidation but only a specific part of it. Subsection (h), on the other hand, concerns itself with distributions in general.

To hold that subsection (h) controls subsection (f) would be to hold that subsection (f) merely provides that the distribution be considered a dividend and ignores the words "taxable" and "paid." Under the rulings of the courts, a distribution in liquidation is not considered a dividend. Hellmich v. Hellman, 276 U.S. 233, 48 S.Ct. 244, 72 L.Ed. 544, 56 A.L.R. 379. But by the language of subsection (f), Congress included in the category of dividends for the purposes of the Section that which was not previously considered a dividend. Congress further provided that distributions which they included in the category of dividends should be treated "as taxable" and "paid." On this point, it is of interest to note that the inclusion of the word "paid" came as a result of action by the Senate in the form of a committee amendment adopted on the motion of the Committee on Finance of that body. 80 Congressional Record p. 8792. This strengthens the conclusion that it was purposefully inserted.

To me it seems that the most logical interpretation of the relationship between the two subsections is found in the language of the Board of Tax Appeals, in the opinion in the Credit Alliance Corporation case when it said:

"In our opinion, Congress by subsection (h) intended to cover dividend distributions and to say that, if taxable, they confer dividends paid credit; and, separately, intended by subsection (f) to cover a different category, to wit, distributions in liquidation, and to say that, although not within the category of 'dividends', they shall be treated so as to confer dividends paid credit, to the limited degree provided in subsection (f)."

Certainly the Congress intended that subsection (f) should have some meaning which would not be completely nullified and negatived by subsection (h). To my mind, this is the only logical interpretation that can give due weight to the congressional intent indicated by the inclusion of both of the subsections.

In addition to the disallowance of the dividends paid credit, defendants disallowed and collected taxes on an item of $675 for accounting and legal services. This disallowance was on the theory that all of the services rendered were for the reorganization and should properly have been set up in the capital account as organization expense of the New Company. Having held against the defendant upon the question of reorganization and since the services were rendered to the Old Company which went out of existence during the taxable year, these items were properly chargeable to expense and properly deductible as such. In addition to that, the undisputed testimony shows that, of the $675, $450 were for ordinary, regular accounting and legal services which had nothing to do with the transaction involved in this case. Under any theory of the case, plaintiffs were entitled to deduct $450 as a part of the Old Company's ordinary operating expenses.

Findings of fact and judgment may be prepared in accordance with this opinion.